## RIPLEY et al. v. TRINITY RIVER CANAL AND CONSERVANCY DIST. et al.

### No. 12154.

Court of Civil Appeals of Texas. Dallas.
Nov. 2, 1935.

Rehearing Denied Dec. 7, 1935.

John W. Pope, Sr., of Dallas, for appellants.

Renfro & McCombs, of Dallas, and Ireland Hampton, S. J. Callaway, and Rob't C. Pepper, all of Fort Worth, for appellees.

LOONEY, Justice.

George A. Ripley and R. C. Hickey, resident electors of the city of Dallas and of the Trinity River Canal and Conservancy District, Dallas County, and owners of taxable property embraced within the boundaries of said district, brought this as a class suit for themselves and others similarly situated, against the district, its directors and the tax collectors of the counties of Dallas and Tarrant, also serving the district in that capacity, seeking injunctive relief, temporary and perma-

nent, to restrain the collection of a tax of one cent on each $100 assessed valuation of property in said district. Other qualified property taxpaying electors of the district, residents of both Tarrant and Dallas counties, intervened by leave of the court, adopted as their own the allegations of plaintiff's petition, and sought the same relief. On hearing, the court denied the temporary relief sought, from which plaintiffs appealed.

Plaintiffs contended below, and contend here, that the tax levied by the directors of said district, and being collected, was and is void. This contention is based on a number of grounds that we do not deem necessary to discuss, but as it is revealed that the tax was levied July 16, 1935, by the pre-election directors of the district, to raise funds with which to pay certain debts and obligations, ostensibly against the district, previously incurred by said directors, thus presenting for decision this question: Were these pre-election directors authorized to create debts or contract obligations against the district, and/or levy a tax on all taxable property within the district for their payment? If yea, the court below correctly refused the temporary writ; if nay, the court erred in refusing the temporary relief sought, and in such event it would be our duty to grant such relief.

At the outset this question is presented: Defendants urged in a plea filed in the court below, and insist upon the proposition here, that plaintiffs do not possess legal capacity or the right to bring or maintain this action, because in effect it is a collateral attack upon the integrity of the district, and that such an action can only be brought and maintained by the state, or under its authority. This position is untenable. The suit is not an attack upon the pre-election status or existence of the district, nor does it call in question the right of the district to act as such, but simply challenges the validity of the act of the pre-election directors levying the tax, for want of power to create debts and/or levy taxes on property embraced within the district. Our courts have repeatedly held that an injunction will issue to restrain the collection of taxes levied and assessed without authority of law. Davis v. Burnett, 77 Tex. 3, 13 S.W. 613; Court v. O'Connor, 65 Tex. 334; Kerr v. City of Cor-

sicana (Tex.Civ.App.) 35 S.W. 694, 697, affirmed by the Supreme Court, 89 Tex. 461, 35 S.W. 794; Whitham & Co. v. Hendrick (Tex.Civ.App.) 1 S.W.(2d) 907.

The Trinity River Canal and Conservancy District was created by the 42d Legislature at its Regular Session in 1931 (see chapter 161, Special Laws, pp. 313–318), embracing within its boundaries the areas of the cities of Dallas, Dallas county, and Fort Worth, Tarrant county, and a strip of land embracing the Trinity River connecting these cities. The act is quite lengthy, but its pertinent provisions are easily segregated and readily understood.

The district was not created full panopliedly by the Legislature, but it did establish instantly its pre-election status, and named the directors to serve for that period. The emergence, whether or not of the district from its pre-election or initial status, into a "preliminary" or secondary status, and from that into a permanent or final status, was made to depend upon the approving votes of the qualified electors of the district at elections authorized by the act. As originally provided, it was the duty of the pre-election directors, within 180 days next after the effective date of the act, to order such an election; but by an amendment, effective September 29, 1931, they were authorized to order the election at any time prior to December 31, 1935, submitting to vote of qualified electors "the following issue, viz.: Approving creation of the district and the levy of a preliminary tax of not to exceed two cents (2c) on each One Hundred Dollars ($100) of assessed values, and contrarily, 'For dissolution of the district,'" and also at said election nine directors were to be selected to serve as "preliminary" directors, if the voters, by a majority vote, approved the creation of the district and, in such event, i. e., the approval of the district, and only in such event, would the district be entitled to exercise the powers conferred by the act; contrarily, the act provides that, "If at such election a majority of the electors voting therein vote 'For dissolution of the district,' it shall be so" (see subdivision (b), § 3, as amended at the Second Called Session of the 42d Legislature, chapter 6, pp. 12–14, printed Session Acts). Pursuing the matter further, the act provides that, if the electors approve the creation of the district, the preliminary directors elected at the same time could enter upon promotion work, such as having surveys and expert investigations made and data gathered, with the end in view of selling the proposition to the federal government. The transition of the district from the preliminary to a permanent or final status, or contrarily to a final dissolution, is described in subdivision (c) of section 6, as follows: "The time during which the herein provided preliminary directors or their appointed successors shall serve, shall be until such time as the Federal Government shall have approved the construction of said Canal, under a proposed contract with the district, and said contract shall have been approved or rejected by a vote of the electors of said district. It is provided, however, that all Directors shall serve until such time as their successors shall have been duly chosen and qualified. At such time as the Federal Government may have proposed a contract with said District, and at the same time, when the same is submitted to the electors of the District for approval or rejection, it shall be the duty of the preliminary board hereby provided to include in the election the choice of Directors to control said District, if any such contract shall have been approved by the electors of the District. After any such election the preliminary Board of Directors shall canvass the returns of such election, declare the result thereof, and qualify their elected successors in the manner, so far as applicable provided by said Chapter 25 (Act Regular Session of 39th Legislature); At such time the preliminary period of this District and the duties of the preliminary Board of Directors thereof shall be at an end. It is provided, however, that in case at such election the voters determine to reject the proposed contract between the District and the Federal Government, the preliminary Directors hereby provided shall continue to serve until such time as the District may be dissolved and its obligations discharged, as is provided for in case of dissolution of a District under the provisions of said Chapter 25."

Clearly the act contemplates that the district could have three distinct periods of existence: The first was established instantly by the act, the other two were inchoate, but during each period, the district was to be governed by a board of directors, differently classified. That is, (1) the "pre-election," (2) the "prelim-

inary," and (3) the final and permanent; each was charged with the performance of definite but different duties, and vested with appropriate powers. As the district had not emerged from its primal status at the time the tax in question was levied, we are only required to determine the duties and powers of such pre-election directors.

After levying the tax, the directors ordered the election provided for in subdivision (b) of section 3 of the act, as amended, to be held (and the same was held throughout the district), on August 24, 1935, in connection with a special election held throughout the state on the adoption or rejection of certain proposed constitutional amendments, and according to the face of the returns, the electors, by a majority of 2,390, voted in favor of the dissolution of the district; but at the time of the hearing below, the result had not been officially declared. However, we do not deem the result of that election, one way or the other, as of any moment in determining the duties and powers of these pre-election directors.

After the effective date of the act, and before the election was ordered, the pre-election directors employed a general manager, at a salary of $750 per month, and had surveys and scientific investigations made and data gathered, with the view of convincing the federal government that the project was feasible and meritorious, and to induce it to take over the establishment and operation of the enterprise. In the pursuit of these activities, in addition to back salary due the manager (amount not ascertained), the directors essayed the creation of other debts and obligations on behalf of the district, to wit, borrowed from the Continental National Bank of Fort Worth the sum of $5,000, secured by an assignment of the taxes to be collected from the levy in question; also became indebted to the Chambers of Commerce of the cities of Dallas and Fort Worth, for advances in an amount exceeding $60,000, of which amount the general manager promised to pay out of the 'tax money from twelve to twenty thousand dollars. Thus, it appears that these pre-election directors assumed the duties and attempted the exercise of powers that were conferred by the act, alone upon the preliminary or secondary directors, described in subdivisions (a) and (b), section 4 of the act, as follows: "(a) To

make preliminary investigations and surveys in the manner and for the purposes specified in said Charter (Chapter) 25 (either independently at its own cost, or jointly with others, or to contribute to the cost thereof when done by another), whereby to procure cooperation by others, and especially to procure cooperation by the Government of the United States of America, to the end that said Canal may be approved for construction as a federal project under such contractual terms and conditions as may be demanded by the Federal Congress. (b) To expend all sums reasonably deemed to be necessary or expedient for seeking cooperation in accomplishing the objects of this Act from the Federal Government, and, or, any and all other persons, creatures or entities, whether natural or creatures of law, or contract, and especially in procuring the Congress of the United States of America to approve said Canal as a Federal project, to be provided, maintained and operated by the Federal Government, which powers shall include the right to pay the reasonable cost of procuring the creation of this District."

Counsel for defendants contend that, under the provisions of the act itself, these pre-election directors were authorized, on behalf of the district, to incur the indebtedness mentioned and levy the tax in question. This contention is shown by the following excerpts from their brief; they argue: "The Legislature by the passage of chapter 161, Special Acts of the 42d Legislature, Regular Session, created the defendant district for the preliminary period therein stipulated, as a governmental agency, a municipality, body politic and corporate, with authority, among other powers, to levy, assess and collect the tax in question for the years 1931 to 1935, inclusive, without a favoring vote of the taxpaying voters of the district * * *. The above proposition involves a construction of the Act itself. The act divides the life of the district into two distinct periods: one which is referred to as the preliminary period. It is to exist from the time the Act takes effect up until such time as the federal government renders a definite decision, either for or against the construction of the canal in question (subdivision (c), section (6). The second period is from such date forward. Likewise, the act defines and describes the powers and duties of the directors of the

district for each period separately." Counsel, we think, either overlook or ignore the provision of the act establishing "three classifications of directors" (section 6, subd. (a). In addition to this specific classification, the act we think is instinct with the meaning that the district, as created, could have three (not two) periods of existence, each distinct from the others, and that during each period, the directors for that period were charged with duties and clothed with powers different and distinct from those of the other two.

We are of opinion that the acts of the pre-election directors, creating debts and obligations against the district and levying the tax in question, were not only impliedly but expressly prohibited. Subdivision (a) of section 6, containing the provision establishing three classifications of directors, also provided that the powers of the pre-election directors "shall be confined to those duties fixed by subdivision (b) of Sec. 3." A reading of subdivision (b), § 3, discloses that the only duty imposed on pre-election directors was to order and cause to be held an election, submitting to the qualified electors of the district the question, "Approving Creation of the District and the Levy of a Preliminary Tax of not to exceed two cents (2¢) on each One Hundred Dollars ($100.00) of Assessed Values' and, contrarily, 'For dissolution of the District,' " and further the selection of nine directors "for its preliminary period." They had no other duty to perform and, in our opinion, were neither authorized to create debts, contract obligations against the district, nor levy taxes against the property therein.

The amendment to subdivision (b) of section 3, effective September 29, 1931, heretofore referred to, concludes with a provision, not found in the original act, as follows: "And provided, further, that prior to the holding of such election, the pre-election directors shall not have power to create debts or contractual obligations against the District." Furthermore, it is provided in subdivision (a), § 6, that these directors were to serve without compensation, or any allowance for personal expense incident to such service. Section 2 of the act, establishing the initial status of the district, concludes as follows: "This provision, however, shall be subject to the further provisions of this Act relating to the manner in which said District shall be dissolved, in case the electors thereof so determine." And further, to the point, the act provides in subdivision (b) § 3, that, if on receiving the returns of the election the directors (pre-election) ascertain that "the voters approving the creation of the District exceed in number the contrary votes, this District immediately shall be entitled to exercise the powers by this Act conferred." The implication from this provision is inescapable that, prior to this event, the district, under the pre-election directors, was not entitled to exercise the powers conferred by the act.

Pre-election directors are nowhere expressly authorized to levy a tax, and such power cannot exist by implication. A political subdivision of a state, such as the district in question, has no inherent power to levy taxes, and if the power exists at all, it must be expressly granted. Local taxation involves two distinct acts of legislation: (1) That by the State Legislature conferring the power to tax (absent in the instant case), and (2) that by the local body levying the tax under the authority previously given. See State v. Houston & T. C. Ry. Co. (Tex.Civ.App.) 209 S.W. 820; Texas Bitulithic Co. v. Dallas, etc., Co. (Tex. Civ.App.) 248 S.W. 746, 748; 61 C.J. (taxation) page 84 § 11, and authorities cited in notes.

We have reached the conclusion that the trial court erred in refusing to issue the temporary writ of injunction sought by appellants; hence its judgment is reversed, and judgment is here rendered, granting appellants the temporary injunctive relief prayed for.

**Reversed and rendered.**